Filed 6/17/15  In re Skyler M. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION 2

| | |
|---|---|
| In re Skyler M. et al., Persons Coming Under the Juvenile Court Law. | |
| NAPA COUNTY HEALTH & HUMAN SERVICES,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>Brittany M.,<br><br>        Defendant and Appellant. | A143007<br><br>(Napa County<br>Super. Ct. No. JV17261, JV17262) |

**INTRODUCTION**

Brittany M. (mother) appeals from the juvenile court's order terminating her parental rights with respect to her now 7-year-old daughter, Bethany M., and her 4-year-old son, Skyler M.  She contends that the dependency court erred in concluding that the beneficial parental relationship exception to the termination of parental rights did not apply.  Finding no error, we affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**[1]

In October 2012, the Napa County Department of Health and Human Services (Department) received three general neglect referrals regarding then 5-year-old Bethany

---

[1] Only the mother has appealed the juvenile court's termination of parental rights, accordingly the following discussion only includes facts relevant to her appeal.

and 19-month-old Skyler. On October 11, 2012, the Department conducted an unannounced visit to the family home. Social workers found the home dirty and in a state of disrepair, with dog feces and dirty litter boxes on the floor; doors broken with holes in them; and marijuana, butane, unidentified chemicals, and apparent drug paraphernalia (such as sharp cutting blades and broken light bulbs) within reach of the children. The home had little food, and Bethany was unable to report the last time she ate. Mother bore visible injuries from a recent domestic violence incident, which occurred in front of the children, and mother reported that father had become increasingly violent with her. Mother admitted that both she and father smoked marijuana and that father additionally used methamphetamine.

The children were removed from the home and placed in protective custody. Four days later, the Department filed a juvenile dependency petition pursuant to Welfare and Institutions Code section 300, subdivision (b).[2] At the initial detention hearing, the juvenile court found that the children should be detained for their protection and scheduled a jurisdiction hearing. Both parents initially contested jurisdiction, but at the December 6, 2012 jurisdiction hearing, each submitted on the petition. The juvenile court found jurisdiction, maintained the children in foster care, and scheduled a disposition hearing.

The disposition hearing was held on December 20, 2012. The juvenile court found that the mother had made "minimal" progress towards alleviating or mitigating the causes of the children being placed outside the home and declared the children to be dependents of the court. The disposition order required mother to comply with a Reunification Plan that included that she (1) secure/maintain a stable, safe, and sanitary place for the children to live; (2) complete parenting classes; (3) participate in counseling or therapy addressing her past domestic violence issues; (4) attend weekly domestic violence support group meetings; (5) participate in out-patient drug treatment services

---

[2] All statutory references are to the Welfare and Institutions Code unless otherwise noted.

through Napa County Drug and Alcohol Services and attend a minimum of three Narcotics Anonymous meetings per week; (6) submit to random drug testing; and (7) participate in the Substance Abuse Management Recovery System (SARMS).

For the first six months, mother made significant progress toward reunification. Mother had been living in a safe, stable and structured environment until she had a relapse with drugs in May 2013. She had consistently visited her children and had progressed to unsupervised visits (until her relapse), and social workers observed her utilizing the lessons she learned in parenting classes. Additionally, mother actively participated in her counseling, domestic violence support group, and substance abuse classes. The six-month status report stated that mother was on the "path of reunification" but needed "more time to do this in a healthy, productive, protective manner."

The Department filed a 12-month status report on October 28, 2013. A Department social worker wrote that mother "never seemed to fully recover" from her May 2013 drug relapse and had failed to secure safe, secure, and structured housing. Following the May 2013 relapse, the Department reverted mother's visitation from unsupervised visits to supervised visits. By August 2013, the Department again permitted mother to have unsupervised visits with her children and provided mother the option of adding another visit with her children in a more "naturalistic setting[]" so that she could "demonstrate being able to manage the children during normal, day-to-day routines." Mother, however, did not take advantage of this opportunity, cancelling with the foster parents for various reasons, including mother not wanting to "feel overwhelmed." The Department found mother's inability to demonstrate "her ability to manage the children for more than one visit per week" concerning. Eventually, the Department reverted mother's visitation back to supervised visits after mother stopped attending her substance abuse services. Ultimately, the Department concluded that there was not a reasonable probability that the children could be returned home by the statutory deadline of April 11, 2013, and recommended terminating family reunification services and scheduling a section 366.26 hearing.

The juvenile court held a contested 12-month review hearing on December 12, 2013. The court found that mother had not made the "necessary progress in her services to have the children returned to her safely. She's not in compliance with her drug treatment services. She's not attended the case plan requirements." The court stated that this was critical because the parents' substance abuse was "the significant issue in this case." The court acknowledged that mother "loves her children very much," but stated that the record demonstrated that mother had "not put reunification as a clear priority." Her actions were not consistent, and she had not made significant progress.[3] As a result, the juvenile court terminated reunification services and scheduled a section 366.26 hearing.

On March 25, 2014, the Department filed its section 366.26 report. A Department social worker wrote that both Bethany and Skyler required a stable, predictable home environment. The social worker observed a visit between the children and mother on March 11, 2014, and reported that Bethany was excited to see her mother in the lead up to the visit, exclaiming "I want to see her right now!" The social worker, however, reported that mother "appeared to be under the influence during the visit, as evidenced by her glazed eyes and blunted motor movement." While mother was "loving toward her children during the visit, [she] was unable to meet both children's needs at the same time and became overwhelmed easily." And when the children became "dis-regulated" during the visit, mother would meet the children's' "intensity and volume, instead of talking in a calm voice to down-regulate them." The social worker observed that the children "do not appear to view their mother as a parental figure; they do not seek her out to have their needs met, instead they operate separately from their mother." Ultimately, the Department concluded that while mother was "able to provide some parenting during their visits, Bethany and Skyler are in need of permanency. At this time, the Department

---

[3] On February 24, 2014, the children's' maternal grandparents filed a section 388 motion requesting that both children be placed with them. The juvenile court denied this motion after a multi-day hearing on July 8, 2014. The maternal grandparents appealed this decision and that appeal remains pending.

strongly believes the need for permanency outweighs any other exception that can be raised with regard to the birth parents."

On April 3, 2014, the Court Appointed Special Advocate (CASA) for the children filed a recommendation for the section 366.26 hearing. The CASA noted that the children had, at that point, been living in foster care for approximately 18 months. In the CASA's opinion, the children were adoptable, and it was in their "best interest to be provided permanency through adoption."

The juvenile court held the section 366.26 hearing on September 9, 2014. The court heard testimony from three witnesses. Christina Grattan, a Department social worker, testified as to the children's adoptability and how each had developed in foster care. Kate Kaltenbach, a Department social worker who had supervised two visits mother had with the children and observed other visits, testified about mother's relationship with Bethany and Skyler. Kaltenbach acknowledged that Bethany missed her mother and was excited for her visits, but mother had more of a "peer to peer kind of relationship" with the children, and there did not appear to be any "parental guidance" during the visits. Mother testified that her children were bonded to her as demonstrated by Bethany running into her arms, saying she loved her, and wanting to spend the day together. Mother stated that Skyler referred to her as "mama." Mother described her visits and discussed bringing the children snacks, watching movies, and playing. Mother stated that a continuing relationship would benefit the children because she was their mother and because she understood her "disease" and would be able to spot any signs of criminal behavior in her children.

Following closing argument by the attorneys, the juvenile court judge noted that she was not the judge who had terminated reunification services nine months earlier in December 2013. She stated that "if we had more time to offer the mother services I don't know that I would be terminating parental rights today." The court continued: "But given the factor that we are in essence out of time I have to find, make certain findings in order to be able to extend additional services to mother. And we're not at a place where we can simply return the children to mother under a family maintenance plan. [¶] So at this point

5

the court is going to find that the department has shown by clear and convincing evidence that both Bethany and Skyler are likely to be adopted. . . . [¶] The court feels that mother, while mother has been visiting with the children, and I think that's definitely beneficial to the children, I don't believe that mother has met her burden of proof as far as today whether this is a beneficial relationship . . . . [¶] So at this point the court will terminate parental rights."

## DISCUSSION

The sole issue on appeal is mother's contention that the juvenile court erred in failing to find that she had established the beneficial parental relationship exception to adoption.

At a section 366.26 hearing, the juvenile court must select and implement a permanent plan for the dependent child. Where there is no probability of reunification with a parent, the preferred plan is adoption. (*In re K.P.* (2012) 203 Cal.App.4th 614, 620.) "If the court determines . . . by a clear and convincing standard, that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption." (§ 366.26, subd. (c)(1).)[4]

Section 366.26, subdivision (c)(1)(B) sets forth exceptions to the preference for adoption if the court finds a "compelling reason" that termination of parental rights would be detrimental to the child. The exception at issue in this case applies if termination would be detrimental to the child because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship" (the beneficial parental relationship exception). (§ 366.26, subd. (c)(1)(B)(i).) It is the parent's burden to show the applicability of a statutory exception to adoption. (*In re Fernando M.* (2006) 138 Cal.App.4th 529, 534.)

The beneficial parental relationship exception "applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional

---

[4] Mother does not challenge the juvenile court's finding that the children were adoptable within the meaning of section 366.26, subdivision (c)(1).

attachment from child to parent." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) "No matter how loving and frequent the contact, and notwithstanding the existence of an 'emotional bond' with the child, 'the parents must show that they occupy "a parental role" in the child's life.' [Citations.] The relationship that gives rise to this exception to the statutory preference for adoption 'characteristically aris[es] from day-to-day interaction, companionship and shared experiences. Day-to-day contact is not necessarily required, although it is typical in a parent-child relationship.' [Citation.] Moreover, '[b]ecause a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement.' [Citation.]" (*In re K.P.*, *supra*, 203 Cal.App.4th at p. 621.)

"The factors to be considered when looking for whether a relationship is important and beneficial are: (1) the age of the child, (2) the portion of the child's life spent in the parent's custody, (3) the positive or negative effect of interaction between the parent and the child, and (4) the child's particular needs. [Citation.] While the exact nature of the kind of parent/child relationship which must exist to trigger the application of the statutory exception to terminating parental rights is not defined in the statute, the relationship must be such that the child would suffer detriment from its termination. [Citation.]" (*In re Angel B.* (2002) 97 Cal.App.4th 454, 467, fn. omitted.)

California courts are divided as to the correct standard of review of an order denying the applicability of an exception to termination of parental rights. Most courts have reviewed such an order for substantial evidence. (See, e.g., *In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 576; *In re Casey D.* (1999) 70 Cal.App.4th 38, 52-53 & fn.4.) The abuse of discretion standard has also been applied. (See, e.g., *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351.)

Still other cases have blended these approaches based on the view that the beneficial parental relationship exception involves making two determinations, a factual one and a discretionary one. The first, whether a beneficial relationship exists, is a factual determination properly reviewed for substantial evidence. The second, whether

7

that relationship constitutes "a compelling reason for determining that termination would be detrimental to the child" (§ 366.26, subd. (c)(1)(B)), requires the juvenile court to "determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption," and is appropriately reviewed for abuse of discretion. (*In re K.P.*, *supra*, 203 Cal.App.4th at p. 622; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315.) We will apply this standard.

Mother testified that the children were excited to see her during visits, missed her, expressed love for her, and referred to her as mother. Further, after initially being placed in foster care, Bethany "grieved" over her mother and father.

Nonetheless, substantial evidence supports the juvenile court's finding that mother failed to carry her burden of demonstrating a beneficial parental relationship with Bethany and Skyler. Mother must do more than show " 'frequent and loving contact,' " an "emotional bond with the child," or pleasant visits and instead must show that "he or she occupies a 'parental role' in the child's life." (*In re Derek W.* (1999) 73 Cal.App.4th 823, 827.) Here, the juvenile court heard testimony from a social worker who characterized mother's relationship with Bethany and Skyler during visitations as more of a "peer to peer" relationship lacking in "parental guidance." This same social worker had written in the section 366.26 report that it appeared the children did not "view their mother as a parental figure" and did "not seek [mother] out to have their needs met, instead they operate separately from their mother."[5] Mother testified that she had heard both children refer to their foster mother as "mom."

---

[5] Mother challenges these statements by the social worker, noting that the social worker had "only supervised two visits in the last year and had 'flip flopped' in other areas of her testimony." At the May 15, 2014, hearing on the grandparents' section 388 petition for custody of the children, the social worker testified that both Bethany and Skyler had "significant emotional needs." The March 25, 2014, report prepared for the section 366.26 hearing, however, did not reference these concerns and found the children adoptable. This apparently led the juvenile court to admonish the department at the conclusion of the section 366.26 hearing on September 9, 2014, that it "needs to be very careful as to how it phrases its testimony and shouldn't flip flop depending on the type of

At the time of the section 366.26 hearing, Bethany and Skyler had already spent approximately two years in foster care, which was over half of Skyler's young life and almost a third of Bethany's. During this time, both children had developed emotionally and mentally. After being removed from his mother's care, Skyler initially was unable to communicate and threw "big tantrums." By the time of the section 366.26 hearing, Skyler had progressed with his oral expression, did not throw tantrums or use profanity, and developed the ability to calm and soothe himself. Bethany entered foster care displaying inappropriate sexualized behavior, used profanity, and suffered from anxiety—all of which had declined or stopped during the 2 years in foster care. Similarly, despite being 5 years old, Bethany had been unable to identify colors, letters, or count. At the time of the section 366.26 hearing, by contrast, Bethany had begun school and progressed to the second grade.

While the children were in foster care, mother struggled to progress beyond supervised visitations. Mother estimated she had only 15 to 20 unsupervised visits with her children during the two years they were in foster care. When mother had the opportunity to add an additional weekly visit in a more "naturalistic" setting that would allow her to demonstrate her ability to manage her children, mother declined out of a fear of becoming "overwhelmed." (*In re K.P.*, *supra*, 203 Cal.App.4th at p. 621 ["Day-to-day contact is not necessarily required, although it is typical in a parent-child relationship."].) Mother did not establish that the relationship resembled the "consistent, daily nurturing

evidence that's being sought. I do recall very specifically that these children were described as special needs children at the 388 petition, and all of a sudden we're being told that, no, the children are doing great. They're ready to be adopted."

Mother's challenge to the social worker's testimony is unavailing. First, while the social worker testified that she had personally supervised only two visits, she testified that she had observed other visits, and that progress reports made at still other visits were consistent with her observations. Second, the social worker explained that the children had made significant progress in self-regulating their emotions and displaying less anxiety and acting out. In any event, the juvenile court's admonishment to the Department reflects that the court considered the entirety of the social worker's testimony (including any arguable inconsistency) in making its uncontested finding that there was clear and convincing evidence that the children were adoptable.

9

that marks a parental relationship" (*In re Derek W.*, *supra*, 73 Cal.App.4th at p. 827), or that Bethany and Skyler were strongly bonded to mother as their parent. On this record, substantial evidence supports the court's decision.

## DISPOSITION

The order of the court is affirmed.

_____

Miller, J.

We concur:

_____

Kline, P.J.

_____

Stewart, J.